UNITED STATES of America and Shammai Bienenstock, Revenue Agent of the Internal Revenue Service, Petitioners-Appellees,

v.

CHEMICAL BANK, Respondent,

Automated Bread Distributing Corp., Taxpayer-Intervenor-Appellant.

No. 51, Docket 78–6076.

United States Court of Appeals, Second Circuit.

Argued Oct. 25, 1978.

Decided Jan. 17, 1979.

Irving Mandel, Forest Hills, N. Y., for taxpayer-intervenor-appellant.

David M. Jones, Asst. U. S. Atty., S. D. N. Y. (Robert B. Fiske, Jr., U. S. Atty., Carol A. Fein, Patrick H. Barth, and William G. Ballaine, Asst. U. S. Attys., New York City, of counsel), for petitioners-appellees.

John B. Wynne, New York City, for respondent.

Before FRIENDLY, MULLIGAN and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

This is an appeal by the intervenor taxpayer, Automated Bread Distributing Corp. ("Automated") from an order of the District Court for the Southern District of New York (Hon. Lloyd F. MacMahon, *Judge*), enforcing a third-party summons issued to the Chemical Bank ("the Bank") for certain Bank records relating to the taxpayer's account. 26 U.S.C. § 7602.[1] The sole issue raised is the validity of the third-party summons. This appeal does not involve an attempt to enjoin the Internal Revenue Service ("IRS") from examining the books and records of the corporate taxpayer itself for the years in question.

### A.

The challenged administrative summons was issued by Revenue Agent Bienenstock of the Internal Revenue Service ("IRS") on June 3, 1977 in connection with an audit investigation of Automated's tax return for the fiscal year ending September 30, 1974, and directed the Bank to produce all signature cards and account cards for Automated and all account statements for the year in question for all of the taxpayer's accounts.

IRS also sent a notice, as is now required, to Automated on the same day. Automated invoked its statutory right to direct the Bank not to comply. 26 U.S.C. § 7609(b)(2). The Bank, apparently through a slip-up, nevertheless mailed the documents to the IRS which, upon discovering the contents, replaced them in the envelope and resealed it without examination. Thereafter the Revenue Agent personally returned the envelope to the Bank. It is these documents which are the subject of the summons and of the enforcement order contested by the taxpayer. 26 U.S.C. § 7609(b)(1). The enforcement order was issued after an oral hearing and upon affidavits and briefs. No evidentiary hearing was held.

### B.

In October 1975, Automated received a notice that its tax return for the fiscal year ending September 30, 1974 was to be audited by Revenue Agent Bienenstock. The

---

1. 26 U.S.C. § 7602 provides:

For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary is authorized—

(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

(2) To summon . . . any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, . . . to appear before the Secretary at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.

agent worked on the premises for several days and was given access to all of the taxpayer's books and records including the original bank statements and cancelled checks. He also met with the accountants for the taxpayer and reviewed their work papers with them.

On April 5, 1976, the taxpayer's attorney wrote to the Revenue Agent noting that the agent was continuing to conduct an audit for fiscal year ending 1974. The attorney requested to be notified

> whether you are a Special Agent assigned to this matter or, if not, whether you have been or are acting in behalf of or in conjunction with or under the instructions of any law enforcement agency.
>
> In short, my client is interested in knowing whether your examination of its books and records is a "routine" examination or otherwise.

The IRS Group Manager responded by letter on June 24, 1976 stating that Bienenstock was not a Special Agent and that it was not a routine audit, but that the return was "being examined as an independent audit within the Brooklyn District Internal Revenue Service Strike Force Program." The letter stated further that the agent was not acting "on behalf of or in conjunction with or under the instruction of any Law Enforcement Agency in regard to the examination." The Manager added that the examination "will follow the procedures outlined in the Techniques Handbook for In-Depth Audit Investigations." Finally he stated that "[n]o documents or information pertaining to this examination have been communicated to any law enforcement agency."

The taxpayer's attorney apparently wrote again, for there is an IRS response to his letter of August 16, 1976. This IRS reply of September 21, 1976 stated: (1) IRS "is one of a number of Federal Agencies that participates [sic] in the Strike Force Program. The Criminal Division of the Department of Justice coordinates this program"; (2) no one "has communicated any information learned from the audit to any

law enforcement agency"; (3) information pertaining to the Techniques Handbook for In-Depth Audit Investigations may be obtained by writing to Internal Revenue Service, Freedom of Information Reading Room, in Washington, D. C.

### C.

From this exchange of correspondence, Automated derives that the administrative summons was issued "where the sole objective of the investigation was to obtain evidence for use in a criminal prosecution." The contentions made by the corporate taxpayer are that the summons, and hence the enforcement order, were issued unlawfully.

As a second line of attack, the taxpayer contends that the enforcement order is an unauthorized "second examination" and should not have been granted because the summons calls for information already in the possession of the Commissioner, thereby subjecting the taxpayer to unnecessary investigation. This is in alleged violation of 26 U.S.C. § 7605(b), and the language of *United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964), which indicated that "good faith" on the part of the Commissioner is required, including a showing that "information sought is not already within the Commissioner's possession . . . ."

### I.

The use of income tax evasion prosecutions as a weapon against organized crime goes back more than a half-century to the days when the tensile strength of the Commerce Clause was not yet fully appreciated in the halls of Congress. In that era, such income tax prosecutions were almost the sole means for federal intervention into the area of local crime.[2] Today, with an arsenal of other federal criminal statutes available, one may no longer assume that a tax examination of a purported organized crime figure is presumably for the purpose of a *criminal* tax evasion prosecution. Nor, with

---

**2.** *See* Gurfein, *Racketeering,* 13 Encyclopedia of Social Sciences (1934).

the supposed infiltration of organized crime into legitimate business, need it be supposed that the civil enforcement of the revenue laws is not itself an important concern.

It is a quite natural development for the resources of several federal agencies to combine in the task of investigating organized crime and its ventures into legitimate business.[3] These [Joint] Strike Forces, which include a representative of the IRS, are coordinated by the Criminal Division of the Department of Justice. Appellant contends that the relationship between the IRS and the Strike Force coordinated by the Department of Justice is itself enough to establish that the sole purpose of the tax investigation is to obtain evidence for use in a criminal prosecution, presumably for some crime whether tax-related or not. It does not necessarily follow, however, that because of the coordination, the Internal Revenue Service cannot remain autonomous in its tax examinations. The issue, as posed, calls for a further review of the relationship between the Revenue Agent on the scene and the Department of Justice Attorney in charge of the Strike Force. Before we attempt such an analysis, however, we turn to the current state of relevant judicial authority.

We start with the recognition that the Examinations Division (formerly the Audit Division) of the IRS has extremely broad authority, including the power to issue summonses, which are prescribed by statute, 26 U.S.C. § 7602. *See* note 1, *supra.* The limitation on the use of such summonses by the IRS has been the subject of consideration by the Supreme Court in recent years.

Difficulty began with dictum in *Reisman v. Caplin,* 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964), where the Court said that a summons could be challenged on the ground "that the material is sought for the improper purpose of obtaining evidence for use in a criminal prosecution . . ."

In *Donaldson v. United States,* 400 U.S. 517, 533, 91 S.Ct. 534, 544, 27 L.Ed.2d 580 (1971), the Court explained that the *Reisman* dictum was limited to the situation "of a pending criminal charge or, at most, of an investigation *solely* for criminal purposes" [emphasis added]. The *Donaldson* opinion then went on to conclude that "an internal revenue summons may be issued in aid of an investigation if it is issued in good faith and prior to a recommendation for criminal prosecution." *Id.* at 536, 91 S.Ct. at 545.

The juxtaposition of the good faith language and the objective "pre-recommendation" test led to a dispute among the lower courts as to whether impermissible entanglement of the summons power and the criminal process occurred only when the summons was issued *after* a recommendation for criminal prosecution, or whether it could occur even *before* such a recommendation if the purpose of issuing the summons was to collect evidence for use in a criminal proceeding. This court thought in *United States v. Morgan Guaranty Trust Co.,* 572 F.2d 36 (2d Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 89, 58 L.Ed.2d 114 (1978), that *Donaldson* had embraced the objective standard which made the decision turn on whether a formal recommendation to prosecute had already been made to the Department of Justice. We refrained from so holding definitively only because the Supreme Court had granted certiorari in a pending case that presented the issue for decision. *United States v. LaSalle Nat. Bank,* 554 F.2d 302 (7th Cir.), *cert. granted,* 434 U.S. 996, 98 S.Ct. 632, 54 L.Ed.2d 489 (1977).

In *United States v. LaSalle Nat. Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), the Supreme Court did construe *Donaldson* but in a way that left some questions open. While four dissenting justices followed Judge Friendly's *Morgan Guaranty* opinion, 437 U.S. at 320–21, 98

**3.** Nothing we say in this opinion should be taken as an indication that we believe the taxpayer or any person affiliated with it is a member of organized crime. The thrust of our discussion is that even assuming the contrary, there is no presumption that an in-depth audit is more significantly oriented to tax prosecution when suggested by a Strike Force than by a computer. For the citizen who is a mistaken target, there is no way to allow the defense of lack of probable cause without upsetting the entire scheme of federal tax collection.

S.Ct. at 2369 (Stewart, J.),[4] holding that the line of cleavage was the referral to the Department of Justice for criminal prosecutions, the majority did not adopt the objective standard without any limitation whatever. The majority accepted our objective formulation generally, but, in addition, imposed a test that incorporated some additional possibilities.

Mr. Justice Blackmun's opinion recognized that, of course, tax conduct which can support criminal prosecution will almost inevitably be the basis for civil penalties as well. The Court, conceding that the "Government does not sacrifice its interest in unpaid taxes just because a criminal prosecution begins," 437 U.S. at 311–12; 98 S.Ct. at 2365, reasoned that the recommendation for a criminal prosecution should serve as a cut-off, however, on prophylactic grounds. The majority went on to hold, nevertheless, that there were some unusual circumstances when even *before* a recommendation for prosecution a summons might be held invalid. As illustrated in the opinion, these unusual circumstances would be present if a recommendation were delayed for the purpose of gathering further evidence for the prosecution of the offense, or when the IRS acted merely as an "information-gathering agency for other departments, including the Department of Justice, regardless of the status of criminal cases." 437 U.S. at 316–17; 98 S.Ct. at 2367–68 [footnote omitted]. In either case, however, the limitations on the issuance of a summons relate only to the conduct of the IRS in its "institutional posture", 437 U.S. at 316; 98 S.Ct. at 2367, not to the subjective intent of the particular agent. 437 U.S. at 313 n.15, 316–17; 98 S.Ct. at 2365 n.15, 2367–68. "While the special agent is an important actor in the process, his motivation is hardly dispositive." 437 U.S. at 315; 98 S.Ct. at 2367.

There is no suggestion in this case that a recommendation for prosecution has been delayed. On the contrary, a special agent is not yet on the scene. Nor can it be said that "the Service in an institutional sense ha[s] abandoned its pursuit of [Automated's] civil tax liability." 437 U.S. at 319; 98 S.Ct. at 2368.

It is necessary to consider, however, whether the participation of the Service in the Strike Force makes it, without more, an information gathering agency for the Department of Justice as described by *LaSalle*. The thrust of appellant's argument appears to be that *any* involvement with a Strike Force by the IRS agent is forbidden by the illustration in the majority opinion in *LaSalle*. We do not think so. In *United States v. Cleveland Trust Co.*, 474 F.2d 1234, 1236 (6th Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 48, 38 L.Ed.2d 118 (1973), the Sixth Circuit noted:

> And we know of no reason why, if gross receipts of the corporation had been falsely understated, the fact that information was provided to the civil side of the Internal Revenue Audit Division by agents usually concerned with criminal prosecution [the Strike Force] should immunize the taxpayer corporation from investigation as to its civil liability for additional taxes.

See *United States v. DeLuca*, 72–2 U.S.T.C. ¶ 9738 (E.D.N.Y.1972), *aff'd without opinion*, 474 F.2d 1336 (2d Cir. 1973).

At the outset, we cannot assume that the Department of Justice would create a Strike Force whose very activity would be unlawful from the start. There is no doubt, of course, that the Department of Justice sometimes steps over the line and that the courts refuse to sanction the misstep. In the general course of law enforcement, however, the judiciary does not anticipate that the Government will act unlawfully. When it does, there is usually the time as well as the means to repair the damage. That is why injunctions to restrain criminal law enforcement are generally not granted.

---

**4.** The dissenting opinion of Mr. Justice Stewart was concurred in by the Chief Justice, Mr. Justice Rehnquist and Mr. Justice Stevens. The dissenters would also have reversed the judgment, but with instructions to order enforcement of the summons, rather than remand to the District Court for further proceedings.

In attempting to match the requirements of the *LaSalle Bank* decision with the institutional posture of the IRS we have examined (1) the IRS 4235 Manual, Techniques Handbook for In-Depth Audit Investigations ("Techniques"); (2) the IRS Special Enforcement Program contained in IRS 4500 Manual, Collateral Income, Estate, and Gift Tax Procedure, § 4566 *et seq.*; and (3) the IRS Handbook on Disclosure of Official Information, IRM 1272 ("Handbook"). What appears is as follows.

An in-depth audit begins where a normal tax examination ends. Its objectives are set forth as "ferreting out the sources and amounts of untaxed income; locating hidden interests and assets, and bringing to justice those who have blatantly deprived the Government of revenue, properly due." Techniques § 132. The in-depth audit's "primary objective, *including the determination of correct taxable income*, is to ascertain whether the taxpayer being audited has fully complied with the applicable Internal Revenue laws." § 211 (emphasis added).

As previously indicated, a Strike Force is a project in a selected city in which various federal enforcement and regulatory agencies concentrate their efforts on designated organized crime subjects. The Strike Force designates the subject to be audited by IRS, but thereafter the IRS is autonomous and its agents do not work under the direction of the Strike Force. IRM §§ 4566.6, 4566.7. While there is some expectation that an in-depth audit will uncover information of relevance to criminal investigators, "the ideal conclusion of any in-depth audit investigation should be to obtain facts to establish the taxpayers' correct tax liability." Techniques § 6(14)0(1).

We agree with the Sixth Circuit in *Cleveland Trust Company, supra,* that an in-depth audit does not lose its character as a civil tax examination simply because it begins at the suggestion of Strike Force personnel. The IRS gets "tips" about tax-

payers from all kinds of sources, including anonymous letters. And, of course, the tip—whatever its source—will stimulate a genuine interest in possible civil tax recovery, as well as in the potential for criminal prosecution. *See* IRM § 4566.6 ("Final authority concerning taxpayers to be investigated by IRS will be vested in IRS."). The Commissioner " 'can investigate merely on suspicion that the law is being violated, or even just because [he] wants assurance that it is not.' " *United States v. Powell, supra,* 379 U.S. at 57, 85 S.Ct. at 255.

More troubling, however, is the continuing cooperation maintained between IRS and the Justice Department attorneys who coordinate the Strike Force. We do not read *LaSalle* as suggesting that the receipt of information or advice from the Strike Force is enough to make the IRS an "information gathering agency for other departments." *LaSalle* recognized that the process of examination leading toward civil or criminal liability was not separable and could produce interaction between departments of Government. The only *caveat* related to the likelihood of subterfuge if Justice fraudulently used the IRS only for the purpose of ferreting out information it could not otherwise obtain without an open disclosure of its interest in something other than civil tax liability. The critical fact here is that the IRS is not *institutionally* subservient to the Department of Justice when the two participate in a Strike Force. Nor is the IRS on the scene simply to service Justice. While revenue agents are assigned to work cooperatively with the Strike Force, they remain under the control of their own superiors in the Service.

Indeed, Congress has established procedures which prohibit individual IRS agents from acting as conduits to the Strike Force. 26 U.S.C. § 6103, as amended, imposes severe restrictions on the disclosure of tax returns and tax information supplied by or concerning the taxpayer.[5] In pertinent

---

5. "Return" and "return information" are broadly defined to include records and reports and even evidence taken regarding any item in the

tax return or schedules. 26 U.S.C. § 6103(b)(1) & (2). The statute also distinguishes between information supplied by the taxpayer, and that

part it provides that returns or such information may be disclosed only to attorneys of the Department of Justice (including United States attorneys), "personally and directly engaged in . . . preparation for any proceeding (or investigation which may result in such a proceeding) before a Federal grand jury or any Federal or State court in a matter involving tax administration" and only on compliance with certain procedures. 26 U.S.C. § 6103(h)(2) & (3). Moreover, a court order issued on reasonable cause is required for the turnover of *taxpayer*-supplied records for other than tax-related criminal prosecutions. 26 U.S.C. § 6103(i)(1). And with respect to information needed for non-tax administration enforcement purposes and not obtained from the taxpayer (like the bank records here) there must be a request in writing from the head of the Federal Agency with a statement of its statutory authority and the need for the information. 26 U.S.C. § 6103(i)(2). The Secretary of the Treasury may, in any case, turn over such "non-taxpayer" material as may constitute evidence of a violation of federal criminal laws. 26 U.S.C. § 6103(i)(3). The In-Depth Audit is not excepted from the conditions thus imposed.

To safeguard the information obtained about the taxpayer, the chain of command for revenue agents in Strike Force operations remains exclusively in the IRS which encourages the exchange of information *within* the Service itself. This includes keeping its own Criminal Enforcement Division advised where appropriate. The Audit Guidelines indicate, however, that "Service records or information may not be provided in Strike Force matters unless the Assistant Attorney General, Criminal Division, submits a written request pursuant to applicable regulations (*See* 26 C.F.R. § 301.-6103(a)–1(g).)." [6] Techniques § 916(1); *see* § 916(3). The new successor to that regulation permits inspection of returns and related information by Justice Department at-

torneys in tax-related matters upon written application to the Treasury Secretary, as provided by the statute. 43 Fed.Reg. 55,759 (1978) (to be codified in 26 C.F.R. § 301.-6103(h)(2)–1). The only relevant exception to the *written* application requirement occurs when the request concerns a case actually referred for prosecution by the Treasury Department. Of course, once there has been a referral, *LaSalle's* "objective" prohibition of the summons comes into play. Similarly, Temporary Regulation § 404.-6103(i)–1 tracks the statutory requirements of § 6103(i) with respect to obtaining "return information" for use in non-tax proceedings.

Agents are subject to criminal penalties for the unauthorized disclosure of taxpayer information. 26 U.S.C. § 7213; *see* 18 U.S.C. § 1905.

 Participation of individual revenue agents in Strike Force activities, in sum, does not alter the institutional system of procedures that must always be invoked for the transfer of information. Under the governing statute and its own regulations, IRS's independent information gathering function is not *per se* altered by inclusion of some revenue agents in a task force coordinated by the Justice Department, because the agents are not in a position to gather information for another department of Government either at their will or under a general directive. Thus, IRS does not become an "information gathering agency" for the Justice Department merely by permitting its agents to cooperate in the Strike Force program.

On the face of it, the Strike Force does no more than suggest the taxpayer for in-depth audit. Dissemination of the fruits of the audit does not lie in the discretion of Revenue or Strike Force officials under existing law. In view of the serious consequences of violation of the privacy of taxpayer records, which include criminal penal-

---

forthcoming from other sources. § 6103(b)(2) & (3).

**6.** Section 301.6103(a)–1(g) has been superseded by 43 Fed.Reg. 55,759 (1978) (to be codified in 26 C.F.R. § 301.6103(h)(2)–1). *See also* Temp. Reg. 26 C.F.R. § 404.6103(i)–1.

ties for official violators, we cannot rush to the judgment that the Strike Force and its Revenue personnel have given each other a license to evade statutory law or the pertinent regulations. There will be time, if a breach of faith should occur, to move for suppression of the evidence so obtained if grounds for such a motion exist. *Cf. United States v. Tweel,* 550 F.2d 297 (5th Cir. 1977).

■■■ In the face of the affidavits by the IRS personnel that they have transmitted no evidence to the Department of Justice, we see no benefit to be gained from an evidentiary hearing. *Contrast United States v. Marine Midland Bank,* 585 F.2d 36 (2d Cir. 1978) (per curiam) (remand for a hearing on how far a conceded recommendation for criminal prosecution had "proceeded through the machinery."). We find no irregularity that would presumptively invalidate the summons.[7]

## II.

■■ Appellant also urges non-enforcement of the summons upon the ground that the IRS is not entitled to a "second examination" and that it is "unnecessary," 26 U.S.C. § 7605(b), because the IRS has already examined the material it now seeks to obtain by the third-party summons,[8] *see United States v. Powell, supra,* 379 U.S. at 58, 85 S.Ct. at 255.

Judge MacMahon correctly concluded that the statutory restriction against second examinations applies only to the taxpayer's own records, and not to records of third parties like the Bank. *United States v.*

*Dawson,* 400 F.2d 194, 200 (2d Cir. 1968) (alternative holding), *cert. denied,* 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969).

Appellant challenges the continued reliance on this authority in the light of the Tax Reform Act of 1976 which granted the taxpayer the right to intervene in a third-party summons enforcement action. 26 U.S.C. § 7609(b). But the congressional history establishes that the right of intervention was not intended to change existing law regarding summonses. S.Rep.No.94–938, 94th Cong. 2d Sess., 370 (1976), 1976 U.S.Code Cong. & Admin.News, pp. 3439, 3800.

■ Finally, there is no merit to the taxpayer's contention that the checks and bank accounts sought have already been seen in the taxpayer's possession, and that this prohibits "unnecessary" further summoning the bank. We note, by way of illustration, that checks deposited by the taxpayer are reflected in bank records showing clearing house numbers which identify the bank on which each check was drawn, thus leading to identification of the payor. Moreover, a subpoena to a bank for all accounts of the taxpayer may flush out related bank accounts that were not previously disclosed.

## III.

We observe, in conclusion, that, notwithstanding our reading of applicable law, the membership of the IRS representative in the Strike Force could, in practice, lead to complications of an undetermined nature, particularly because of the provision that

---

7. Automated alleges that IRS abandonment of civil tax liability should be inferred because the audit was begun 2½ years before the summons was issued and IRS made no assessments or determinations of civil liability during that period. But it is not extraordinary for audit investigations to take a considerable amount of time, *see Application of Magnus,* 299 F.2d 335, 337 (2d Cir.), *cert. denied,* 370 U.S. 918, 82 S.Ct. 1556, 8 L.Ed.2d 499 (1962), and the fact that the IRS is still actively pursuing the matter raises no presumption either way.

8. 26 U.S.C. § 7605(b) reads:
 Restrictions on examination of taxpayer.— No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

"liaison will be maintained with all concerned parties to insure proper dissemination of any additional information concerning the subjects being examined." Techniques § 431(4).

Upon this record there is no indication that a search for civil liability has been abandoned. And there has been specific denial that the Revenue Agent has been supervised in his work by the Strike Force or that he has turned over information to it.

It may be wise, nevertheless, for the Government to separate the information gathering activity of revenue agents from the activities of the Strike Force with more clearly defined formality.

The order granting enforcement is affirmed.